UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CHARLES STALTER,

                    Plaintiff,

    -against-

COUNTY OF ORANGE, KENNETH JONES, and
DENNIS BARRY,

                    Defendants.

No. 15-cv-5274 (NSR)

OPINION & ORDER

---

NELSON S. ROMÁN, United States District Judge

 Plaintiff Charles Stalter brings this action against Defendants the County of Orange ("County of Orange"), Kenneth Jones, and Dennis Barry (collectively, "Defendants") alleging violations of his rights under the First Amendment. Presently before the Court is Defendants' motion to dismiss the Complaint (ECF No. 1) pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (ECF No. 19.) For the following reasons, Defendants' motion is GRANTED in part and DENIED in part.

## BACKGROUND

 The following facts are taken from the Complaint unless otherwise noted, and are accepted as true for purposes of this motion.

 In 2006, the County of Orange hired Plaintiff as a Corrections Officer in the Orange County Jail. (Compl. ¶ 11.) In 2010, Plaintiff transferred to the Criminal Division of the County of Orange as a Deputy Sheriff. (*Id.* ¶ 14.) Plaintiff was placed on a probationary term for that position and was granted permanent status in January 2012. (*Id.* ¶¶ 15–18.)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/5/2016

In or about October 2012, Plaintiff was estranged and separated from his then pregnant wife and had moved out of their marital residence.  (*Id*. ¶ 21.)  Also in or about October 2012, Plaintiff met another Deputy Sheriff, Janine Johnson, who was hired in March 2012 and still completing her probationary term.  (*Id*. ¶¶ 19–20.)  In January 2013, Plaintiff became romantically involved with Johnson.  (*Id*. ¶19.)  In or about March 2013, Plaintiff and Johnson began living together and have since resided together.  (*Id*. ¶ 23.)  Also in March 2013, Plaintiff's spouse filed for divorce, an action that was still pending when this case was commenced.  (*Id*. ¶ 22.)

In early February 2013, Plaintiff's mother-in-law advised Plaintiff that she had spoken to Defendant Barry, who at the time served as a captain in the Orange County Sheriff's office and now is the Chief Deputy Sheriff.  (*Id*. ¶¶ 6, 26.)  Plaintiff's mother-in-law told Plaintiff that she informed Barry of rumors that Plaintiff was romantically involved with a female deputy.  (*Id*. ¶ 26.)  When Plaintiff confronted Barry, he denied having spoken with Plaintiff's mother-in-law.  (*Id*. ¶¶ 28–29.)  During that conversation, Plaintiff disclosed to Barry that he was romantically involved with Johnson.  (*Id*. ¶ 27.)  Barry responded by telling Plaintiff that he should limit his contact with Johnson, but did not formally order him to do so.  (*Id*. ¶ 30.)  On or about February 7, 2013, Barry told Johnson that he was aware of her relationship with Plaintiff and that they were in violation of the office's non-formal "anti-fraternization policy."  (*Id*. ¶ 31.)  Barry told Johnson that she should end her relationship with Plaintiff, but did not formally order her to do so.  (*Id*. ¶ 34.)  At the time Barry spoke to Johnson, there was no formal policy prohibiting romantic relationships between equal ranking officers; however, Barry maintained that the Sheriff's Office prohibited casual romantic relationships.  (*Id*. ¶¶ 31–33.)  On or about February 15, 2013, Plaintiff and Johnson exchanged several text messages while riding together as

passengers in the back seat of a county vehicle to and from a meeting in White Plains.  (*Id.* ¶ 35.)
After discovering that Plaintiff and Johnson had been texting, Barry informally reprimanded both
of them and officially separated them at work.  (*Id.* ¶ 36.)

On or about February 22, 2013, Plaintiff learned that his estranged spouse had withdrawn
all of the money from his bank account and exhausted his credit cards.  (*Id.* ¶ 37.)  On that same
day, while both were off duty, Plaintiff visited Johnson's residence to access her internet.  (*Id.* ¶
37.)  While he was at Johnson's residence, Plaintiff's wife and mother-in-law arrived and
unlawfully entered Johnson's residence.  (*Id.* ¶ 38.)  An altercation ensued in which Plaintiff's
mother-in-law assaulted Johnson, which prompted Plaintiff to call the police.  (*Id.* ¶¶ 38–39.)
When the police arrived, they took statements and ultimately charged Plaintiff's mother-in-law
with, *inter alia*, assault. (*Id.* ¶ 39.)  During the altercation, Plaintiff's wife called Barry and told
him that her mother was being arrested for assault.  (*Id.* ¶ 41.)  Barry then told Jones, the
Undersheriff of Orange County, and Investigator Gorelick, who was dispatched to the scene, to
direct both Plaintiff and Johnson to report to him after the police cleared the scene.  (*Id.* ¶ 42.)

Plaintiff and Johnson later reported to Barry, who assigned them to desk duty on different
shifts and confiscated their weapons.  (*Id.* ¶ 43.)  Barry then officially ordered Plaintiff to cease
all contact, including off-duty contact, with Johnson.  (*Id.* ¶ 44.)  Jones ordered Johnson to cease
all contact, including off-duty contact, with Plaintiff.  (*Id.* ¶ 44.)  Plaintiff and Johnson spent the
night together on February 23, 2013 but had no further contact until on or about March 18, 2013.
(*Id.* ¶ 47.)

On or about February 26, 2013, Jones ordered Johnson to draft a memo to him detailing
her contact with the Plaintiff during the preceding eight weeks.  (*Id.* ¶ 48.)  Johnson submitted a
memorandum to Jones, which included the night of February 23, 2013 (one day after Jones's

order to cease contact with Plaintiff). (*Id.* ¶ 49.) On March 18, 2013, the Sheriff's Office, through then-Chief Richard P. Onorati, charged Johnson with misconduct. (*Id.*) Johnson was suspended without pay for two weeks and sanctioned with a six month extension of her probationary term. (*Id.* ¶ 59.) Additionally on March 18, 2013, the Sheriff's Office charged Plaintiff with misconduct. (*Id.* ¶ 52.) The charges against Plaintiff sought his termination; however, Plaintiff challenged the charges and was suspended pending resolution of the charges by arbitration. (*Id.* ¶¶ 54, 61.) During Plaintiff's suspension, he and Johnson continued their relationship while both were off-duty. (*Id.* ¶ 62.)

On May 6, 2013 Barry ordered Johnson to provide him with a memorandum detailing all contact she had with Plaintiff since returning to work. (*Id.* ¶ 63.) On May 8, 2013, Johnson responded that she regularly had contact with Plaintiff while off duty and at her private residence in Sullivan County. (Compl. ¶ 64.) On May 10, 2013, Johnson was notified that her employment was terminated for "failure to complete your probationary term." (*Id.* ¶ 65.) About a week later at a meeting with the Appointing Authority, Johnson was advised that her employment was terminated because of her relationship with Plaintiff, and not her job performance. (*Id.* ¶ 66.)

On or about September 6, 2013, Johnson commenced an action in New York State Supreme Court, County of Orange, and named the County of Orange itself and Carl Dubois, the elected Sheriff of Orange County, as respondents. (*Id.* ¶¶ 9, 67-68.) Johnson claimed that her termination was arbitrary, capricious, and in violation of her constitutional right to intimate association because her termination was premised upon her romantic relationship with Plaintiff. (*Id.* ¶ 67.) Additionally on September 6, 2013, Plaintiff provided a sworn affidavit in support of Johnson's petition (the "Affidavit"). (*Id.* ¶ 69.) In the Affidavit, Plaintiff provided testimony

that was critical of Barry and the Sheriff's Office, and supported Johnson's contention that her termination was improper and unlawful. (*Id*. ¶ 70.) The Affidavit also included testimony that the Sheriff's Office had knowledge of other intra-office romances in the past, and officers in these relationships had not been similarly punished. (*Id*. ¶ 72.) Plaintiff provided three, specific examples of other intra-office romances in which the participants were not subject to the same punishment. (*Id*. ¶ 73.) Jones was aware of the Affidavit, as he provided an affidavit in support of the county's motion to dismiss Johnson's petition. (*Id*. ¶ 74.) Plaintiff also claims that Barry was aware of the Affidavit, because of Barry's high rank and substantial involvement in the events leading to Johnson's termination. (*Id*. ¶ 75.)

On September 3, 2013, Plaintiff was charged with possession of stolen property. (*Id*. ¶ 78.) The stolen property was his old Sheriff's ID, which Plaintiff was required to have turned in when he obtained a new ID. (*Id*. ¶ 78.) Plaintiff claims that when he obtained the new ID, nobody ever advised him that he needed to return the old one. (*Id*. ¶ 79.) The Sheriff's Office learned that Plaintiff still had the ID and charged him with improperly possessing it. (*Id*. ¶ 81.) On September 12, 2013, Plaintiff's arbitration commenced. (*Id*. ¶ 77.) Plaintiff entered in a settlement agreement with the Sheriff's Office in resolution of both the March 18, 2013 charge and the September 3, 2013 charge. (*Id*. ¶ 82.) Plaintiff agreed to a 120 day suspension without pay as a result of the charges. (*Id*. ¶ 83.)

On December 2, 2013, Plaintiff returned to work. (*Id*. ¶ 84.) Upon his return, he was ordered to complete 30 days of field training ("FTO"), which entails riding with another deputy and completing FTO sheets indicating his performance in certain areas. (*Id*. ¶ 85.) Approximately 45 days after his return, Plaintiff handed in the FTO sheets to his direct supervisor, Sergeant Marron. (*Id*. ¶ 86.) Sergeant Marron approved the FTO sheets and passed

them on to Lt. Dreyer, who approved them and passed them on to Lt. Hamil, who approved them and passed them on to Captain Barry. (*Id.* ¶¶ 87–89.) Barry rejected the FTO sheets as inadequate, claiming that none of the deputies completing Plaintiff's FTO sheets other than Deputies Bell and Monahan were authorized to do so. (*Id.* ¶ 90.) Plaintiff was ordered to re-complete his FTO. (*Id.* ¶ 93.) Plaintiff claims that all of the deputies that approved his FTO sheets had been allowed to sign off on FTO sheets for other deputies without incident. (*Id.* ¶ 91.) Plaintiff also claims that nobody had ever advised him that when he began his FTO that only Bell and Monahan could sign off on his FTO sheets, and that he was led to believe that all of the deputies he rode with were allowed to sign off for him. (*Id.* ¶¶ 91–92.)

On or about February 19, 2014, Plaintiff received an email from the FTO sergeant, Sgt. Butterfield, stating that he was only allowed to FTO with Deputy Bell or Deputy Monahan, and if neither were available, that he was to remain at the station. (*Id.* ¶ 94.) That day, Plaintiff contacted his PBA[1] representatives and complained that the Sheriff's Office was acting unreasonably with respect to his FTO. (*Id.* ¶ 95.) Approximately two weeks later, the PBA contacted Jones and advised him that the Sheriff's Office could only require Plaintiff to complete "refresher training," not FTO. (*Id.* ¶¶ 96–97.) Subsequently, Jones and Barry still required Plaintiff to report to Sgt. Butterfield, complete FTO Sheets, and only ride with Sgt. Bell or Sgt. Monahan. (*Id.* ¶ 97.)

About two weeks later, Plaintiff submitted another packet of completed FTO sheets to his supervisor Sgt. Marron. (*Id.* ¶ 98.) Sgt. Marron approved the sheets and advised Plaintiff to submit them to Lt. Dreyer. (*Id.* ¶ 99.) Lt. Dreyer told Plaintiff that the FTO sheets "looked

---

[1] The PBA that Plaintiff references throughout the Complaint stands for Police Benevolent Association of the County of Orange. They are a labor union that represents the County of Orange Sheriff's Department and represented Plaintiff during the time the allegations occurred.

good," but that his current status would continue until he heard otherwise. (*Id.* ¶ 100.) About three or four days later, with 24 hours' notice, Plaintiff was transferred from the A-Line shift to the B-Line day shift, in violation of the collective bargaining agreement, which requires that a deputy have at least 28 days' notice prior to a transfer. (*Id.* ¶ 101.) Plaintiff was advised on his transfer that he "did not need to worry about FTO," but that he was only permitted to ride with one of the seven deputies on that shift, or not at all. (*Id.* ¶ 102.) Plaintiff claims that Lt. Hamil and Sgt. Pallen, two higher ranking officers, met with four of the deputies assigned to ride with Plaintiff and directed them to find violations so that they could write Plaintiff up. (*Id.* ¶ 103.) Plaintiff claims Deputy Galipani told Plaintiff about that meeting and cautioned him that "they were coming for you." (*Id.* ¶ 104.) Plaintiff understood this to be reference to Barry and Jones, from whom all the orders regarding his discipline had originated. (*Id.* ¶ 104.) Plaintiff remained on the B-line shift for about a week, and then was abruptly transferred back to the A-line shift. (*Id.* ¶ 105.) He was also again advised to only ride with Deputy Bell or Deputy Monahan. (*Id.* ¶ 105.) Sgt. Marron also advised Plaintiff that if neither Bell nor Monahan were available, that he could ride by himself in the case of an arrestee pickup or to respond to a 911 poll. (*Id.* ¶ 106.)

On or about April 8, 2014, at about 12:15 a.m., Plaintiff was at the station and heard an emergency call for an officer needing assistance at the Town of Goshen courthouse. (*Id.* ¶ 108.) Plaintiff and Deputy Brandon Edwards responded to the call, and Plaintiff drove Edwards to the courthouse. (*Id.* ¶ 109–15.) It had been raining and the roads were wet, so on the way to the courthouse, as Plaintiff was making a right turn, the car fishtailed and the rear side clipped a guardrail, leaving a scratch on the car. (*Id.* ¶ 116.) Once Plaintiff and Edwards arrived at the courthouse, the situation had de-escalated and their assistance was no longer needed, so they returned to the station. (*Id.* ¶ 117.) Once he returned to the station, Plaintiff reported the

7

accident and damage to the car. (*Id*. ¶ 118.) On May 12, 2014, Barry, having been promoted to Chief, issued a Personnel Order that charged Plaintiff with responding with poor judgment, driving recklessly, leaving the scene of an accident, and damaging a department vehicle. (*Id*. ¶ 119.) The charge sought Plaintiff's termination. (*Id*. ¶ 120.)

Plaintiff was suspended pending resolution of the charges by arbitration. (*Id*. ¶ 123.) Plaintiff claims that the Sheriff's Office has not sought the termination of other deputies alleged to have engaged in similar misconduct. (*Id*. ¶ 124.) In particular, Deputy Pagnillo, who had a prior disciplinary record for damaging department vehicles, ran a red light and was broadsided by a car as he drove through the intersection. (*Id*. ¶¶ 125, 127.) The vehicle in that instance was demolished and his passenger claimed she was injured, and consequently sued Deputy Pagnillo. (*Id*. ¶ 126.) Deputy Pagnillo was offered a 30 day suspension following that incident, and eventually was able to negotiate that to a three week suspension. (*Id*. ¶ 127.)

Plaintiff's arbitration commenced in June 2014, and after one hearing day, the second day was scheduled for October 10, 2014. (*Id*. ¶ 129.) Plaintiff claims that after the first day of the hearing, Jones told the PBA President Lopez that he was going to call Plaintiff back to work, stick him in a small room with no windows where he could "count the ceiling tiles" all day and that, if Plaintiff "so much as broke a pencil," Jones would propound further disciplinary charges. (*Id*. ¶ 130.) Following this conversation, Jones ordered Plaintiff to return to work on July 30, 2014. (*Id*. ¶ 131.)

Prior to his return to work, Plaintiff became "fed up" with being singled out for mistreatment by Barry and Jones for no reason other than his romantic relationship with Johnson and his participation in her litigation against the County, and as a result, Plaintiff decided that he would resign. (*Id*. ¶ 132.) He reported back to work on July 30, 2014, met with his two

captains, and offered them a formal resignation letter.  (*Id*. ¶ 133.)  The letter contained 4 terms:
(1) that he would be placed on full administrative leave until October 10, 2014; (2) that all
discipline and related charges be removed from his personnel file; (3) that the Sheriff's Office
would not pursue any further disciplinary charges against him; and (4) that the Sheriff's Office
would not make any unfavorable remarks about him to other agencies with which he might seek
employment.  (*Id*. ¶ 133.)  The captains seemed receptive, and Captain Hamil indicated that he
needed to call "the Number 2," and left the room to do so.  (*Id*. ¶¶ 134, 136.)  Plaintiff claims
"Number 2" is a reference to Jones, who, as Undersheriff, is the second in command.  Further,
according to Sheriff's Office policy, Jones is the appropriate person that Captain Hamil would
speak to in seeking approval for the proposed conditions in the resignation letter.  (*Id*. ¶ 136.)

        A few minutes later, Captain Hamil returned to the room and stated that the Sheriff's
Office would agree to all terms except the last one.  (*Id*. ¶ 135.)  Plaintiff advised Captain Hamil
that was unacceptable and that the last term was necessary.  (*Id*. ¶ 137.)  Plaintiff stated that he
needed to step out to call his union attorney to advise him of the negotiation process and to get
advice.  (*Id*. ¶ 138.)  Hamil assented and told Plaintiff to do so, knowing that Plaintiff would not
get cell phone service in the building and would have to leave the premises to make the call.  (*Id*.
¶ 139.) Plaintiff left the premises to call the union attorney from the gas station.  (*Id*. ¶ 140.)  The
union attorney did not answer, so Plaintiff left him a message.  (*Id*. ¶ 141.)  A few minutes later,
the PBA vice president, Jeremy Yela, called Plaintiff and told him that Chief Barry was ordering
him back to the premises.  (*Id*. ¶ 142.)  When he returned, he was ordered to go to the Chief's
office.  (*Id*. ¶ 144.)  Once he entered the Chief's office, Barry then slid a letter of resignation
across the table to Plaintiff and told him to sign it.  (*Id*. ¶ 144.)  The letter did not contain any of
the terms in Plaintiff's proposed letter except for the administrative leave until October 10, 2014,

the effective date of his resignation.  (*Id*. ¶ 145.)  Captain Hamil then entered the room and told

Plaintiff he had two minutes to sign the letter.  (*Id*. ¶ 146.)  Hamil told him that if he did not sign

the letter within two minutes, he would be brought up on charges of leaving his post without

authorization and dereliction of duty for having left the premises to call his union attorney.  (*Id*. ¶

147.)  Feeling coerced, Plaintiff signed the letter and left the premises.  (*Id*. ¶ 148.)

## STANDARD ON A MOTION TO DISMISS

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for

failure to state a claim upon which relief can be granted, a complaint must include "sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft

v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 570

(2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct

alleged."  *Id*.  (citing *Twombly*, 550 U.S. at 556).

"When there are well-pleaded factual allegations [in the complaint], a court should

assume their veracity and then determine whether they plausibly give rise to an entitlement to

relief."  *Iqbal*, 556 U.S. at 679.  The court must "take all well-plead factual allegations as true,

and all reasonable inferences are drawn and viewed in a light most favorable to the

plaintiff."  *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).  However, the presumption of truth

does not extend to "legal conclusions, and threadbare recitals of the elements of the cause of

action."  *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal*, 556 U.S. 662) (internal

quotation marks omitted).  A plaintiff must provide "more than labels and conclusions" to show

he is entitled to relief.  *Twombly*, 550 U.S. at 555.

**DISCUSSION**[2]

**I.     First Amendment Retaliation Claim**

"A plaintiff asserting a First Amendment retaliation claim must establish that: '(1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech.'" *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015) (quoting *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011)).  Though Defendants do not dispute that Plaintiff has satisfied the first two prongs of a First Amendment retaliation claim,[3] they assert that he has not alleged sufficiently a causal connection between the protected speech and adverse action.

"'[P]roof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.'" *Hicks v. Baines*, 593 F.3d 159, 170 (2d Cir. 2010) (quoting *Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 117 (2d. Cir. 2000)).  In the present case, Plaintiff alleges only an *indirect* causal connection between the Affidavit and the adverse treatment at work.

---

[2] While the Complaint asserts an Equal Protection claim, Plaintiff withdraws that claim in his opposition papers. (Plaintiff's Memorandum in Opposition to the Defendants' Motion to Dismiss ("Pl.'s Opp."), ECF No. 23, at 5). Courts permit parties to withdraw claims via responses to a motion to dismiss.  *See, e.g., Colliton v. Donnelly*, No. 07-cv-1922 (LTS) (THK), 2008 WL 1910175, at *1 (S.D.N.Y. Apr. 30, 2008) (holding that the plaintiff withdrew two of their seven claims by stating so in their memorandum of law opposing the defendants' motion to dismiss). Therefore, the Court dismisses the Equal Protection claim.

[3] The Affidavit easily satisfies the first prong of a First Amendment retaliation claim.  *See Local 621, S.E.I.U., AFL-CIO v. City of New York*, No. 99 CIV.9025, 2002 WL 31151355, at *16 (S.D.N.Y. Sept. 26, 2002) (holding that testifying truthfully is constitutionally protected from retaliation).  With respect to the second prong, once Plaintiff returned to work on December 2, 2013, Defendants Barry and Jones commenced an ongoing course of retaliation. This course of adverse action included requiring Plaintiff to complete unnecessary FTO and "refresher training," changing his shifts from A-shift to B-shift without proper notice, propounding charges that sought his termination for damaging a department vehicle, and ultimately coercing him into resigning.

11

A.       **Temporal Proximity**

Defendants argue that the temporal proximity between the Affidavit of September 6, 2013 and the adverse treatment that occurred is too attenuated to establish a causal connection. The Second Circuit has held that there is no "'bright line to define the outer limits'" of causation inferred from temporal proximity and encourages district courts to exercise their judgment with respect to permissible inferences that may be made regarding the sufficiency of temporal proximity. *Summa v. Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013) (quoting *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009)). Notably, in analyzing the temporal relationship between protected activity and adverse action, courts focus on whether "the adverse action occurred at the first actual opportunity to retaliate." *Summa*, 708 F.3d at 128.

In this case, when Plaintiff drafted the Affidavit, Plaintiff was suspended from work. Plaintiff alleges that upon his return to work, Defendants Barry and Jones commenced an ongoing course of adverse treatment of Plaintiff. In particular, Barry forced Plaintiff to conduct FTO training, only to reject his FTO sheets even though they were previously approved by other officers. (Compl. ¶ 90.) Plaintiff was only relieved of the FTO training requirement when the PBA President informed Jones that he could only require Plaintiff to undergo refresher training, not FTO. (*Id*. ¶¶ 96–97.) Next, Plaintiff faced disciplinary charges that sought his resignation. (*Id*. ¶ 120.) Finally, Plaintiff was coerced to sign a resignation letter on unfavorable terms. (*Id*. ¶ 148.) Even though the allegedly adverse treatment occurred between 3 to 10 months after Plaintiff provided his sworn statement in the Affidavit, it appears that Defendants retaliated against Plaintiff at the first opportunity they had following the end of his suspension. Accordingly, though Plaintiff's resignation did not occur until 10 months after the Affidavit, the Complaint plausibly alleges a close temporal relationship in light of Plaintiff's allegations that the adverse treatment commenced almost immediately upon his return to work.

12

**B.**     **Disparate Treatment**

In support of his causation argument, Plaintiff also argues that he was subject to disparate treatment.  In particular, Plaintiff asserts that he was treated differently than other employees with respect to his FTO training and the discipline he faced following the April 2014 automobile accident.  With respect to FTO, Plaintiff alleges that Barry told him that only officers Bell and Monahan could sign off on his FTO sheets.  However, Plaintiff alleges that other officers undergoing such training were allowed to seek approval from additional officers.  (Compl. ¶ 91.) Plaintiff also claims that he was treated differently from other officers involved in automobile accidents with department vehicles.  Specifically, Plaintiff alleges that Deputy Pagnillo, who had a prior disciplinary record, ran a red light and collided with another vehicle that injured another officer in the passenger seat.  Deputy Pagnillo's charges sought a 30 day suspension, which was subsequently negotiated down to a 21 day suspension, whereas Plaintiff, who also was involved in an automobile accident, received charges that sought his termination. (Compl. ¶¶ 119–128.) In light of this alleged disparate treatment, as well as Plaintiff's temporal proximity argument, Plaintiff sufficiently alleges a causal connection between assisting Johnson in her case and his adverse treatment.  Therefore, the Court declines to dismiss Plaintiff's First Amendment retaliation claim.[4]

## II.     **First Amendment Intimate Association Claim**

Plaintiff next contends that Defendants violated his constitutional right to intimate association by retaliating against him at work for his relationship with Johnson.  In *Roberts v.*

---

[4] The Court is not persuaded by Defendants' additional defenses to Plaintiff's retaliation claim.  First, with respect to Defendant Barry, Defendants assert that he is not liable because he did not know about the Affidavit.  While lack of knowledge of protected activities on the part of particular individual defendants may defeat an allegation of a causal connection (*Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000) (citing *Alston v. New York City Transit Auth.*, 14 F. Supp. 2d 308, 312–13 (S.D.N.Y. 1998)), the Complaint specifically alleges that Barry knew about the Affidavit.  In particular, Plaintiff alleges that because he mentioned Barry at several points in his sworn statement, it is plausible that the County of Orange's attorneys shared this testimony with Barry.  Second, with

*U.S. Jaycees*, the Supreme Court explained that the Constitution protects "certain kinds of highly personal relationships . . . from unjustified interference by the State." 468 U.S. 609, 618 (1984). While the Supreme Court has not established "precise boundaries" as to which "highly personal relationships" are entitled to constitutional protections, *Bd. of Directors of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 545 (1987), the Court in *Roberts* described them as "involving deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experience, and beliefs, but also distinctively personal aspects of one's life." 468 U.S. at 619. In that vein, the Supreme Court noted that "[d]etermining the limits of state authority over an individual's freedom to enter into a particular association therefore unavoidably entails a careful assessment of where the relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments." *Id*. at 620. Those "objective characteristics" include the "size, purpose, policies, selectivity, congeniality, and other characteristics that in a particular case may be pertinent." *Id*. In the present case, Defendants argue that Plaintiff's extramarital relationship is not the type of "highly personal relationship" protected by the Constitution, and, in any event, Defendants Barry and Jones are shielded from liability by qualified immunity.

In *Bates v. Bigger*, a court from this District was confronted with an intimate association claim for a relationship that closely resembles the relationship between Plaintiff and Johnson. 192 F. Supp. 2d 160 (S.D.N.Y.), *aff'd*, 56 F. App'x 527 (2d Cir. 2002). In that case, the

---

respect to Defendant Jones, Defendants contend that Jones should not be held liable for the adverse treatment of Plaintiff (i.e., the FTO training and coerced resignation) because Jones did not participate in or facilitate those adverse actions. Those arguments are refuted by the well-pled allegations in the Complaint. First, the Complaint alleges Jones was notified by the PBA President that he and Barry were not permitted to force Plaintiff to undergo FTO training. Second, the Complaint alleges that Captain Hamil told Plaintiff he had to consult with the "number 2" regarding Plaintiff's resignation, which Plaintiff understood to be a reference to Jones. Taken as true, Plaintiff's allegations are sufficient to state a claim against Jones.

plaintiffs were two officers in the Orange County Sheriff's Department that alleged they were retaliated against by senior officers in the department for their extramarital affair, in violation of their right to intimate association.  While Judge Conner noted "that the precise nature of their relationship is difficult to define," he concluded that, in light of the fact that the plaintiffs were still living with their spouses when the relationship commenced and that they did not reside together or finalize their divorces until a later date, the "plaintiffs' association during the relevant time frame could therefore be defined as a dating relationship, albeit an extra-marital, adulterous one."  *Id*.  Judge Conner continued that the

> Plaintiffs' relationship may have been "highly personal," and displayed attributes of "relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." However, in the time frame that the complained of events occurred, their association plainly failed to exemplify the considerations that "attend the creation and sustenance of a family."

*Id*. (quoting *Roberts*, 468 U.S. at 620).  Ultimately, Judge Conner concluded that it was "open to debate" as to "whether [the] plaintiffs' relationship was constitutionally protected."  *Id*.  Judge Conner declined to resolve that debate, as he concluded that the individual defendant was entitled to qualified immunity because to the extent the plaintiffs enjoyed a right to intimate association, it was not a clearly established one.  *Id*.  In a summary order, the Second Circuit affirmed Judge Conner's opinion, noting that the Circuit has "not decided whether [the right to intimate association under the First Amendment] applies to persons whose intimate relationship is adulterous."  56 F. App'x 527, 529 (2d Cir. 2002).

The Sixth Circuit also has addressed a similar factual scenario.  *See Marcum v. McWhorter*, 308 F.3d 635 (6th Cir. 2002).  In *Marcum*, the plaintiff, a deputy sheriff, separated from his wife and met a woman, Rena Abbott, through work.  *Id*. at 637.  The plaintiff and Ms.

Abbott did not discuss cohabitation prior to moving in together, and Ms. Abbott described their relationship as a roommate-like relationship.  *Id*.  The district court determined that the relationship between the plaintiff and Ms. Abbott was not entitled to constitutional protection. *Id*. at 638.  The Sixth Circuit affirmed, finding "that the adulterous nature of the relationship does not portray a relationship of the most intimate variety afforded protection under the Constitution."  *Id*. at 640.

The Sixth Circuit relied upon the Supreme Court's decision in *Bowers v. Hardwick*, 478 U.S. 186 (1986).  In *Bowers*, the Supreme Court held that there was no fundamental right of "homosexuals to engage in acts of consensual sodomy," noting that "[p]roscriptions against that conduct have ancient roots."  *Id*. at 192.  Though the Supreme Court in *Bowers* was analyzing the right to privacy, the Sixth Circuit nevertheless found the case instructive in analyzing the right to intimate association.  Drawing upon *Bowers*' reasoning, the Sixth Circuit noted that "proscriptions against adultery have ancient roots."  308 F.3d at 641–42.  The court continued that "[b]ased on the historical treatment of adultery, a right to engage in an intimate sexual relationship with the spouse of another cannot be said to be either deeply rooted in this Nation's history and tradition or implicit in the concept of ordered liberty."  *Id*. at 642.  In light of the fact that *Bowers* was subsequently overruled by the Supreme Court in *Lawrence v. Texas*, 539 U.S. 558 (2003), this Court is not persuaded by the Sixth Circuit's holding in *Marcum*.

As the Supreme Court stated in *Roberts*, a determination of whether a relationship falls within the ambit of the constitutional protections for intimate association requires a "careful assessment of [] the relationship's objective characteristics . . . ."  468 U.S. at 620.  At the motion to dismiss stage, that assessment is necessarily premised upon the description of the relationship in the operative pleadings.  Accordingly, the Court looks to the Complaint's description of the

relationship between Plaintiff and Johnson to determine whether it is the sort of highly personal relationship afforded constitutional protection.  First, with respect to size, the Court notes that the relationship is solely between Plaintiff and Johnson.  Second, Plaintiff's relationship with Johnson is of a romantic nature.  While much of Plaintiff and Johnson's relationship occurred while Plaintiff was still married to his wife, Plaintiff had already filed for divorce in March 2013 and was separated from his wife when he began his relationship with Johnson.  Plaintiff and Johnson have remained exclusive with each other, and continue to maintain a relationship to this day.  Additionally, Plaintiff and Johnson are currently engaged[5] and are soon to be married. From March 2013 to July 2014 while Plaintiff suffered the alleged adverse actions at work, Plaintiff and Johnson maintained their long-term relationship.  In light of the fact that the Court must take the allegations in the Complaint as true at this stage of the litigation, and "[a]bsent binding authority holding that the 'extramarital' nature of the relationship categorically excludes it from protection," the Court cannot say that, as a matter of law, Plaintiff's relationship with Johnson is not entitled to constitutional protection under the First Amendment.  *Fetchick v. Eslinger*, No. 6:15-CV-96-ORL-28TBS, 2016 WL 3030168, at *3 (M.D. Fla. May 25, 2016).

### III.      Qualified Immunity Defense to Intimate Association Claim

Defendants Barry and Jones argue that they are entitled to qualified immunity with respect to Plaintiff's intimate association claim.  "A defendant enjoys qualified immunity if he can show that either '(a) [his] action did not violate clearly established law, or (b) it was objectively reasonable for [him] to believe that his action did not violate such law.'"  *Savino v. Town of Southeast*, 983 F. Supp. 2d 293, 308 (S.D.N.Y. 2013), *aff'd*, 572 F. App'x 15 (2d Cir. 2014) (quoting *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir. 2001)

---

[5] As Plaintiff and Johnson were not engaged at the time the Complaint was filed, Plaintiff references this for the first time in his Memorandum in Opposition to Defendant's Motion to Dismiss the Complaint.  (Pl.'s Opp. at 13, n.7.)

(internal quotation marks and citations omitted)).  In order for a constitutional right to be clearly

established, "[t]he contours of the right must be sufficiently clear that a reasonable official would

understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 635

(1987).  This ensures that a reasonable officer has "fair warning" that his/her conduct violated

the plaintiff's rights. *Hope v. Pelzer*, 536 U.S. 730, 740 (2002).  In analyzing whether or not a

reasonable officer would have received a "fair warning," the court considers "'(1) whether the

right in question was defined with "reasonable specificity"; (2) whether the decisional law of the

Supreme Court and the applicable circuit court support the existence of the right in question; and

(3) whether under preexisting law a reasonable defendant official would have understood that his

acts were unlawful.'"  *Matusick*, 757 F.3d at 60 (quoting *Ying Jing Gan v. City of N.Y.*, 996 F.2d

522, 532 (2d Cir. 1993)).

  Neither the Second Circuit nor the Supreme Court has resolved the issue of whether

extramarital relationships are entitled to constitutional protection.  Accordingly, for the same

reasons as discussed by Judge Conner in *Bates*, as affirmed by the Second Circuit,[6] the Court

finds that to the extent Plaintiff enjoys a constitutional protection for his relationship with

Johnson, that right is not clearly established and therefore Defendants Barry and Jones are

entitled to qualified immunity on Plaintiff's intimate association claim.[7]

---

[6] "Although we have recognized a right to intimate association under the First Amendment, we have not decided whether this right applies to persons whose intimate relationship is adulterous.  Nor has the Supreme Court ruled on the question."  56 F. App'x at 529 (citing *City of N. Muskegon v. Briggs*, 473 U.S. 909, 910 (1985) (White, J., dissenting from denial of certiorari) (observing a split among courts "over whether extra-marital sexual activity, including allegedly unlawful adulterous activity, is constitutionally protected in a way that forbids public employers to discipline employees who engage in such activity.").

[7] While Plaintiff endeavors to argue his right to intimate association is clearly established, the cases he relies upon are not binding upon this Court.  *See, e.g.*, *Silverstein v. Lawrence Union Free Sch. Dist. No. 15*, No. 10-cv-993 (SJF) (WDW), 2011 WL 1261122, at *6 (E.D.N.Y. Feb. 15, 2011), *report and recommendation adopted*, No. 10-cv-0993 (SJF) (WDW), 2011 WL 1261114 (E.D.N.Y. Mar. 30, 2011); *Berrios v. State Univ. of New York at Stony Brook*, 518 F. Supp. 2d 409, 421 (E.D.N.Y. 2007); *and Briggs v. North Muskegon Police Department*, 563 F. Supp. 585 (W.D. Mich. 1983), *aff'd*, 746 F.2d 1475 (6th Cir. 1984), *cert. denied by*, *City of North Muskegon v. Briggs*, 473 U.S. 909 (1985).

IV.     *Monell* **Liability**

The Court now turns to Plaintiff's claims against the County of Orange.[8]  It is well settled

that "[g]overnment officials may not be held liable for the unconstitutional conduct of their

subordinates under a theory of *respondeat superior*."  *Iqbal*, 556 U.S. at 676.  Rather, a

municipal entity can only be held vicariously liable under § 1983 if the "execution of a

government's policy or custom . . . inflicts the injury . . . ."  *Monell v. Dep't of Social Servs. of

the City of N.Y.*, 436 U.S. 658, 694 (1978).  Thus, *Monell* dictates that any § 1983 claim against a

municipal entity must be premised on the theory that the municipal actor's allegedly

unconstitutional "acts were performed pursuant to a municipal policy or custom."  *Patterson v.

Cnty. of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004); *see generally Monell*, 436 U.S. at 692–94.

Courts in this Circuit apply a two prong test for § 1983 claims brought against a

municipal entity.  *Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985) (internal

citation omitted).  First, the plaintiff must "prove the existence of a municipal policy or custom

in order to show that the municipality took some action that caused his injuries beyond merely

employing the misbehaving officer."  *Id.*  "Second, the plaintiff must establish a causal

connection—an 'affirmative link'—between the policy and the deprivation of his constitutional

rights."  *Id.* (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 836, n.8 (1985)).

To satisfy the first requirement, a plaintiff must allege the existence of:

(1) a formal policy which is officially endorsed by the municipality; (2) actions
taken or decisions made by government officials responsible for establishing
municipal policies which caused the alleged violation of the plaintiff's civil rights;
(3) a practice so persistent and widespread that it constitutes a custom or usage and
implies the constructive knowledge of policy-making officials; or (4) a failure by
official policy-makers to properly train or supervise subordinates to such an extent

---

[8] Though the Court dismissed Plaintiff's First Amendment intimate association claim against the individual
Defendants on qualified immunity grounds, the County of Orange is not entitled to assert that defense.  *See Curley v.
Vill. of Suffern*, 268 F.3d 65, 71 (2d Cir. 2001).  Accordingly, the Court addresses the validity of both the retaliation
and intimate association claims against the County of Orange.

that it amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact.

*Moray v. City of Yonkers*, 924 F. Supp. 8, 12 (S.D.N.Y. 1996) (internal citations and quotation marks omitted); *see also Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (quoting *Moray* and updating citations to cases).  A plaintiff is not required to identify an express rule or regulation in order to establish a *Monell* claim, and a court may infer a municipal policy from acts or omissions of the municipality's policy makers,[9] but in the absence of other evidence, a "single incident of errant behavior is an insufficient basis for finding that a municipal policy caused plaintiff's injury."  *Sarus v. Rotundo*, 831 F.2d 397, 402–03 (2d Cir. 1987); *see also DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998) ("[A] single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy.") (quoting *Ricciuti v. N.Y. City Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991)) (internal quotation marks omitted); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 125 (1988) (plurality opinion) (explaining that only municipal officials with "final policymaking authority" concerning particular activities giving rise to plaintiff's claims "may by their actions subject the government to § 1983 liability") (internal citation omitted).  "In the end, therefore, a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the moving force behind the alleged injury."  *Hayes*, 853 F. Supp. 2d at 439 (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008)) (internal quotation marks omitted).

In the present case, Plaintiff propounds two, alternative theories of *Monell* liability.  First, Plaintiff claims that the final policymaker of the County of Orange, Sheriff Dubois, was aware of the actions of Defendants Barry and Jones, and, by not intervening, acquiesced in his

---

[9] In *Pembaur v. City of Cincinnati*, the Supreme Court stated that municipal liability under § 1983 may be established by even the single act of a municipal policymaker whose acts represent official policy.  475 U.S. 469, 480 (1986).

subordinates' actions, rendering their actions official municipal policy.  These allegations, however, do not support any of the cognizable theories of *Monell* liability.  "[R]ubber-stamp[ing]" or "turn[ing] a blind eye" to subordinate decision-making is not sufficient to establish either a municipal policy or the delegation of policymaking authority.  *Baity v. Kralik*, 51 F. Supp. 3d 414, 442 (S.D.N.Y. 2014) (citing *Praprotnik*, 485 U.S. at 130).  Plaintiff cannot assert *Monell* liability simply by alleging Sheriff Dubois, who is not named as a defendant, knew of the actions of his employees.  Plaintiff must demonstrate that the final policymaker *himself* caused the deprivation of rights at issue.  *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989).

Alternatively, Plaintiff contends that Sheriff Dubois delegated all final, disciplinary authority to Defendant Jones, and that Jones' actions constitute municipal policy.  Authority to make municipal policy may be granted either directly by legislative enactment or may be delegated by an official who possesses such authority.  *Pembaur*, 475 U.S. at 483.  The official need not possess broad, policymaking authority; rather, the inquiry for the court is whether the official "had final policymaking authority in the particular area involved." *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000) (citing *Jett*, 491 U.S. at 737; *Praprotnik*, 485 U.S. at 123–25).

Plaintiff's counsel asserted a nearly identical theory of *Monell* liability in *Baity*.  In that case, Plaintiff's counsel "argued that [the sheriff] delegated his hiring authority to the undersheriff [], thus making [the undersheriff] the official policymaker for the County with respect to employment policy in the Sheriff's Office and rendering [the undersheriff] the 'policymaker' for *Monell* purposes."  51 F. Supp. 3d at 441–42.  Judge Karas rejected this argument on a number of grounds: (1) there was no evidence in the record to support the

plaintiff's theory; (2) the plaintiff failed to provide the court with any supporting case law; and (3) the plaintiff did not name the undersheriff as a defendant.  *Id*. at 442.

Notably, the court in *Baity* considered that theory of *Monell* liability at the summary judgment stage.  Accordingly, Judge Karas' first basis for rejecting the plaintiff's argument in *Baity* is irrelevant to the Court's present analysis.  On a motion to dismiss, all Plaintiff is required to do is plead facts that plausibly give rise to an entitlement to relief.  *See Iqbal*, 556 U.S. at 679.  The court must "take all well-plead factual allegations as true, and all reasonable inferences are drawn and viewed in a light most favorable to the plaintiff."  *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).  The Complaint alleges that Sheriff DuBois "delegated all final policy-making authority as to disciplinary matters to defendant Jones."  (Compl. ¶¶ 160, 173.) That assertion is bolstered by the allegation that Captain Hamil told Plaintiff he would have to seek approval of Plaintiff's proposed resignation letter from the Number 2, which Plaintiff contends is a reference to Defendant Jones.  (*Id*. ¶ 136.)  With respect to Judge Karas' second basis for rejecting the plaintiff's theory in *Baity*, the Supreme Court was clear in *Pembaur* that "[a]uthority to make municipal policy . . . may be delegated by an official who possesses such authority . . . ."  475 U.S. at 483.  Finally, Judge Karas' third basis for rejecting the plaintiff's argument in *Baity* is inapplicable here because Plaintiff names Defendant Jones—the Undersheriff of the County of Orange—as a defendant.

While the Court is skeptical that Plaintiff will prevail on his claims against the County of Orange as the case progresses, at this stage of the litigation, Plaintiff sufficiently alleges *Monell* liability on the basis that Defendant Jones was delegated final policy-making authority.  *See Deloughery v. City of Chicago*, No. 02C-2722, 2002 WL 31654942, at *3 (N.D. Ill. Nov. 25, 2002) (expressing skepticism regarding the plaintiff's ability to prove his delegation *Monell*

claim, yet denying defendants' motion to dismiss).  The Court cautions Plaintiff that as the case

progresses, to prove such a claim, Plaintiff must marshal sufficient evidence that Sheriff Dubois

delegated final policymaking authority as to disciplinary matters to Defendant Jones.  Sheriff

Dubois' non-involvement in Plaintiff's termination, absent additional evidence of delegation of

policymaking authority to Defendant Jones, cannot substantiate *Monell* liability.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and

DENIED in part.  The Court dismisses Plaintiff's Equal Protection claims and the intimate

association claim against Defendants Barry and Jones.  The remaining claims are the First

Amendment intimate association claim against the County of Orange and the First Amendment

retaliation claim against all Defendants.  Defendants are directed to file an answer to the

remaining claims within 30 days hereof.  The parties are directed to appear for an in-person

conference on September 28, 2016 at 11:00 a.m.  The parties are further directed to submit a

completed case management plan.  The Court respectfully directs the Clerk to terminate the

motion at ECF No. 19.


Dated:    August 5, 2016
          White Plains, New York

                                                        SO ORDERED:


                                                        NELSON S. ROMAN
                                                        United States District Judge