UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHARLES STALTER,

                        Plaintiff,

    -against-

COUNTY OF ORANGE, KENNETH JONES, and
DENNIS BARRY,

                        Defendants.

No. 15-cv-5274 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

    Plaintiff Charles Stalter ("Plaintiff") brings this action against Defendants the County of Orange ("County of Orange"), Undersheriff Kenneth Jones ("Undersheriff Jones"), and Sheriff's Captain Dennis Barry ("Captain Barry") (collectively, "Defendants") alleging retaliation under the First Amendment and that his Constitutional right to intimate association was violated. Presently before the Court is Defendants' motion for summary judgement pursuant to Rule 56 of the Federal Rules of Civil Procedure (ECF No. 45.) For the following reasons, Defendants' motion is GRANTED.

## BACKGROUND

    The following facts are taken from the Complaint, ECF No. 1, Defendants' Rule Local Civil Rule 56.1 Statement ("Def. Statement"), ECF No. 51, and the Plaintiff's Response and Counterstatement to Defendants' Local Civil Rule 56.1 Statement ("Plf. Resp."), ECF No. 54, unless otherwise noted, and are accepted as true for purposes of deciding this motion.

    In 2006, the County of Orange hired Plaintiff as a Corrections Officer in the Orange County Jail. (Plf. Resp. ¶ 1.) In 2010, Plaintiff was hired as a Deputy Sheriff and successfully

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/5/2018

completed his approximately eighteen-month probationary period. (Plf. Resp. ¶¶ 8-9).     In

about mid-January 2013, Plaintiff began a romantic relationship with another Deputy in the

Sheriff's Department, Janine Johnson ("Johnson"). (Plf. Resp. ¶12.) Plaintiff was married at the

time to Melissa Stalter ("Melissa"), who was pregnant although Stalter and Melissa were

separated at the time.  (Plf. Resp. ¶13.) Johnson and Plaintiff had begun their  relationship while

working in a unit known as the "Deadbeats Task Force" where Stalter was a Deputy Investigator,

a position that was senior to Johnson,  who worked in the Task Force on a part-time basis. (Plf.

Resp. ¶14.)

        Stalter testified that his then mother-in-law, Susan Bodensizek ("Bodensizek"), called

him at 6 a.m. on Feb. 5, 2013, on his County-issued phone (to which only the Sheriff's Office

Administration and 911 have the number) and told him that she was with Captain Dennis Barry

("Barry") and that she was going to ruin Plaintiff's career. (Michael Sussman Declaration

("Sussman Decl."), ECF No. 55, Ex. 3 ("Stalter Dep."), 87:7-18.   On or about that same day,

Plaintiff initiated a meeting with Barry and told Barry that he was romantically involved with

Johnson. (Plf. Resp. ¶20.) There is a dispute over what was actually said in the meeting and its

purpose. Defendants submit that Stalter told Barry he was in an "inappropriate relationship" with

Johnson and that he wanted to disclose this fact to Barry before the chain of command heard

rumors about the relationship. (Worthy-Spiegl Declaration ("Worthy-Spiegl Decl."), ECF No.

46, Ex. E ("Barry Dep."), 12:1-9.)  Plaintiff denies this (Stalter Declaration ("Stalter Decl."),

ECF No. 56 , ¶17)  and contends that he simply advised Barry that he was getting a divorce, that

he was romantically interested in Johnson, and that the two had started seeing each other socially

outside of work and planned to take the relationship to the next level. (Stalter Dep. 96:1-101:18.)

Plaintiff further states that Barry already knew about the relationship. (Plf. Resp. to Def. ¶22.) Defendants submit that Barry did not ask the Plaintiff any questions about the length or nature of the relationship. (Plf. Resp. to Def. ¶ 22.) Plaintiff stated Barry asked him if he was having sex with Johnson. (Plf. Resp. to Def. ¶ 25.) Defendants stated that Barry did not give Stalter advice, direction, guidance or any orders regarding the relationship. (Stalter Dep. 87:1-89:25.) In a later personnel complaint that Barry prepared against Stalter, Barry stated that he told Stalter in the Feb. 5 conversation that Salter could not have a personal/sexual relationship with another member who is subordinate and the fact that he was married would "further complicate the issue." (Sussman Decl. Ex. 6 ("Personnel Complaint"), March 4, 2013, ¶¶2-3.)

Stalter stated that Barry advised him he should limit his contact with Johnson, though he did not issue any formal directive. (Stalter Decl. ¶17.) Stalter further stated that Barry told him that, if the two were in love, then he would just change their shifts and the relationship would not be a problem. (*Id.*) Stalter said he understood Barry's comments to mean that he did not want the relationship to cause any issues at work but that, off duty, what Stalter did in his personal life was not his concern. (*Id.*) Barry did not advise Stalter's direct supervisors in the Deadbeat Task Force, about the subject of their meeting. (Plf. Resp. ¶27.)

On or about Feb. 15, 2013, Stalter and Johnson were passengers in the back seat of a vehicle when they rode together to a meeting to and from White Plains. (Plf. Resp. to Def. ¶31.) Barry was a front seat passenger in the same vehicle. (Plf. Resp. to Def. ¶32.) Barry did not direct or request that Stalter and Johnson travel in separate vehicles. (Plf. Resp. to Def. ¶34.) On the return ride back to the office, Barry suspected that Stalter and Johnson were texting messages to each other while in transit. (Plf. Resp. to Dep. ¶35.)

When Barry returned to the office, he accessed the Verizon management account for Stalter's County-issued telephone and confirmed that Stalter used the County phone to text Johnson during the ride. (Plf. Resp. to Dep. ¶37.) Barry testified that he accessed Stalter's account to determine whether he exceeded the data limit on his County issued phone. (Sussman Decl. Ex. 5 ("Barry Dep.") at 24:1-26:25.)  If an employee exceeds the data limit, the user must reimburse the County for any excess charges. ( Plf. Resp. to Def. ¶39.) Barry did not recall whether Stalter exceeded the allotted data or whether the Sheriff's Office ever sought reimbursement from him. (Barry Dep. 25: 7-16.)

Later on February 15, 2013, Barry inquired why Stalter and Johnson were texting each other back and forth more than 50 times. (Worthy-Spiegl Decl. Ex. E ("Barry Dep.") 29:13-19.) Stalter and Johnson told Barry that they did not believe the texting was inappropriate. (Plf. Resp.¶44.) Barry did not issue any kind of order to Stalter or Johnson during that meeting. Stalter submits that Barry then removed Johnson from the Deadbeats project (Stalter Decl. ¶19.)

On Feb. 22, 2013, Plaintiff stated that he told his supervisor and got approval to take a few hours off to take care of some financial business, assuming that he would return to work that same day. (Plf. Resp. to Def. ¶55.) The Defendants state that Plaintiff took a Sheriff-issued car out of County without telling anyone. (Def. Statement ¶¶58-59.) Plaintiff stated that he had already received approval from Barry to take the car to Johnson's residence, as Plaintiff had been staying there pending his separation and divorce. (Stalter Decl. ¶17.)

Plaintiff did not return to work that day and an altercation occurred at Johnson's residence between Stalter, his wife, Stalter's mother-in-law Bodensizek, and Johnson, which required intervention by law enforcement (Plf. Resp. to Def. ¶67-70.) Stalter was carrying a gun during the incident.  (Plf. Resp. to Def. ¶65.) There is a dispute between the parties about what

happened during the incident. (Plf. Resp. ¶65.) The Defendants contend that Stalter punched Bodensizek in the arm, injuring her arm. (Def. Worthy-Spiegl Decl. Ex. C 147:5-14) Plaintiff contends that he had to punch her in the arm because she was attempting to reach for his gun and he thought that she would kill him. (Janine Stalter Declaration[1] ("J. Stalter Decl."), ECF No. 57, ¶¶25-29; Ex. 3-4.) The State Police arrived and charged Bodensizek with assault against Johnson. (Plf. Resp. to Def. ¶69.) Thereafter, Bodensizek was issued a restraining order to stay away from Johnson. (Plf. Resp. to Def. ¶70.) A year later she was eventually found not guilty by a jury. (Plf. Resp. to Def. ¶71.)

Stalter testified that Bodensizek called Barry during the incident, advised him that she was at Johnson's house with her daughter and Stalter, and that a domestic incident had occurred. (Stalter Dep. 87:7-18- 94:9-14.) Barry had known Bodensizek for nearly a year when the domestic incident occurred. (Sussman Decl. Ex. 6 ¶8.) Bodensizek was the girlfriend of the owner of Orange Hollow racquet club and a member of his golf league and had previously had several conversations with her. (*Id.*) Barry submits that the only social conversation he had had with Bodensizek about Stalter was when she mentioned to him that Stalter was her son-in-law, and Barry told Bodensizek that he was "a good guy" and had just promoted him to investigator. (*Id.*)

Plaintiff submits that after receiving the call from Bodensizek, Barry advised Chief Onorati that there was a domestic incident at Johnson's residence involving Stalter, his wife and Bodensizek. (Plf. Resp. ¶72.) Barry advised Defendant Undersheriff Jones that the state police responded to a domestic incident that occurred at Johnson's residence involving Orange County Sheriff's personnel, Stalter, Johnson, Stalter's wife and Bodensizek. (Plf. Resp. ¶73.)

---

[1] Janine Johnson has since married Stalter and changed her last name to Stalter.

Undersheriff Jones sent internal affairs investigator Barry Gorelick ("Gorelick") to speak to the state police. (Plf. Resp. ¶75.) When Gorelick returned to the office, he advised Jones that Stalter's pregnant wife and her mother went to Johnson's apartment, saw Stalter there, a confrontation ensued regarding Stalter's romantic affair with Johnson, and Bodensiek and Johnson began fighting. (Plf. Resp. to Def. ¶75.) Plaintiff denies that Johnson began fighting with Bodensiek, but stated that Bodensiek physically attacked Johnson. (J. Stalter Decl. ¶25-29; Ex. 3-4.)

After the Feb. 22 incident, Defendants state that Chief Onerati met with Stalter and ordered him to stay away from Johnson. (Def. Statement ¶89; Worthy-Spiegl Decl. Ex. D (Deposition of Kenneth Jones ("Jones Dep.")) 15:3-5.) Plaintiff submits it was Barry who formally ordered Stalter to cease all contact with Johnson on Feb. 22, the day of the incident. (Personnel Complaint ¶6.) Plaintiff points to the personnel complaint that Barry wrote against Stalter in the aftermath of the Feb. 22 incident. (Plf. Resp. ¶82.) Barry testified that he did not recall directing the Plaintiff to cease further contact with Johnson. (Barry Dep. 52:13-20.)   The Personnel Complaint notes that Defendant Undersheriff Jones also ordered Stalter and Johnson to have no contact. (Personnel Complaint ¶6.)  Before giving the order, Undersheriff Jones conferred with Chief Onorati about the domestic incident at Johnson's house. (Plf. Resp. ¶86.) They decided it "it was too volatile of a situation to allow it to continue at that time" and thus decided to order Stalter and Johnson to stay away from each other. (Jones Dep. 38:1-39:1-5.) Defendants submit that Chief Onerati gave the order to cease contact after the incident. (Jones Dep. 15:1-25.)

Plaintiff states there is no evidence that Stalter and Johnson's relationship interfered with their work performance. (Plf. Resp. to Def ¶86.)

On February 23, 2013, Stalter testified that he returned to work and submitted that he followed up with a formal request for leave given his unexpected absence. (Stalter Decl. ¶20.) Following the incident, Defendants claim that Barry did not alter Stalter's employment status or duties and had no authority to do so. ( Barry Dep. 54:1-15.) However, Plaintiff proffers evidence showing that Barry ordered both Johnson and Stalter to desk duty, confiscated their weapons and made Stalter turn in his investigator ID for a regular Deputy ID, in effect altering his duties. (Personnel Complaint ¶6.)

On Feb. 26, 2013, Stalter sent an email to Sheriff DuBois, relative to the Feb. 5 meeting with Barry and stated that he was going to take care of the situation with Janine Johnson and "work it all out." (Plf. Resp. to Def. ¶28.)   Barry and Undersheriff Jones testified that at the time, there had never been a policy governing the romantic relationships of the members of the Orange County's Sheriff's Office. (Plf. Resp. to Def ¶29.) Furthermore, the Sheriff's Office at that time did not have an "anti-fraternization" policy. ( Plf. Resp. to Def ¶30.)

On March 18, 2013, Chief Onorati brought disciplinary charges against Johnson and Stalter and specifically sought Stalter's termination. (Compl. ¶¶50-51.) Plaintiff submits that although Chief Onorati drafted the charges against both Johnson and Stalter, he conferred with Undersheriff Jones and Barry when doing so. (Sussman Decl. Ex. 1 (Defendants' Response to Plaintiff's Interrogatories ( "Def. Resp. Interrogs.") No. 5. At 10.)

Johnson was suspended without pay for two weeks and her probationary term was extended six months. (Plf. Resp. to Def. ¶97.) Johnson did not challenge the disciplinary charges or the penalty and returned to work on April 6, 2013. (Plf. Resp. to Def.  ¶98. ) Chief Onorati directed Johnson to have no contact with Stalter on or off-duty when she returned to work. (Plf.

Resp. to Def. ¶99.) Plaintiff submits that he also conferred with his superior, Undersheriff Jones, about giving the no-contact order. (Jones Dep. 39: 2-5.)

In light of the charges, Plaintiff was specifically directed to return all items issued to him by the Sheriff's Office, including but not limited to clothing, pins, tacks and "literally everything." (Plf. Resp. to Def. ¶108.) As a result of the charges, and consistent with the disciplinary procedure identified in the collective bargaining agreement between Stalter's union and the County of Orange, Stalter was placed on a 30-day unpaid suspension. (Plf. Resp. to Def. ¶109.)

On April 18, 2013 Barry received an unsolicited text message from Stalter's ex-wife, Melissa, that Johnson and Stalter were seeing each other. ( Susman Ex. 9 ("text messages") at 1). The text message asked, "… do you still need any proof against Janine Johnson?" Barry replied, "I will take whatever you have." (Sussman Decl. Ex.9 at 2.)

On May 10, 2013, Johnson admitted in a memo to Barry that she continued to have contact with the Plaintiff regularly while off-duty. (Plf. Resp. ¶100.) On May 10, 2013, Chief Onorati terminated Johnson's probationary employment for failing to complete her probationary term. (Plf. Resp. to Def. ¶101.) Plaintiff further submits that though the termination letter was drafted by Onerati, the decision to terminate Johnson's employment was made by Barry and Jones.  (*Id.*) Defendants state that Barry did not recommend Johnson's termination from employment to the Undersheriff or anyone else. Plaintiff disputes this, pointing to a May 9, 2013 investigative memorandum written by Barry, as evidence that he was the driving force behind the decision.  ((*Id.*); Sussman Decl. Ex. 8 ("Barry Memorandum, May 9, 2013.") at 1.) In the Memorandum, Barry noted the exchange that he had with Stalter's ex-wife and that she sent him

an additional text with a photograph of Stalter's truck parked near Janine Johnson's driveway. (*Id*.) The memorandum makes no mention of Undersheriff Jones.

On September 3, 2013, Chief Onorati brought misconduct charges against Stalter. (Plf. Resp. to Def. ¶110.)

On September 6, 2013, Johnson commenced an Article 78 proceeding against the County of Orange and Sheriff Dubois in New York State Supreme Court, alleging that her termination from employment was arbitrary and capricious and in violation of her right to intimate association on the basis of her relationship with Stalter.[2] (Plf. Resp. ¶114.) Stalter provided a sworn affidavit ("Supporting Affidavit") dated September 6, 2013 in support of Johnson's petition. (Plf. Resp. to Def. ¶115.) In his Supporting Affidavit, Stalter gave three examples of officers in the corrections division only who were married or having an affair with a subordinate officer. (Plf. Resp. ¶116.)

Barry has no supervisory role or responsibilities with respect to corrections officers or employees in the corrections division. (Barry Aff., ECF No. 48, ¶¶8-9.) Stalter does not recall ever speaking with anyone in the command staff about the Supporting Affidavit, including Barry or Jones. (Plf. Resp. ¶119.) Nor did Plaintiff ever observe Barry or Jones looking at or reviewing the Affidavit, and Jones never told Stalter that he reviewed it. (Plf. Resp. ¶120.) Stalter is certain he never spoke with Sheriff DuBois about the Supporting Affidavit. (Plf. Resp. ¶119.) Defendants maintain that Barry was not aware of and did not discuss the statements or allegations with any officer or individual in 2013 or 2014. (Plf. Resp. to Def. ¶121.)

---

[2] The Court takes judicial notice that the Second Department affirmed the Supreme Court's dismissal of Johnson's Article 78 proceeding. See Johnson v. City. Of Orange, 138 A.D.3d 850, 852 (2d Dep't 2016.) appeal dismissed, 27 N.Y.3d 1120 (2016.)

Plaintiff submits that Undersheriff Jones's testimony that "everyone knew" Johnson had commenced Article 78 proceeding because the papers were served at the Sheriff's Office and went up the chain of command, contradicts the notion that Barry was unaware of the suit. (Jones Dep. 114:1-125.) Furthermore, Plaintiff contends that given the Supporting Affidavit makes certain allegations against Barry (Stalter Decl. Ex. 2, ¶18), Plaintiff asserts that it is implausible that Barry was not presented with these allegations by the County's attorneys or others to confirm their veracity. (Plf. Resp. ¶121.) This contention, however, is argument rather than fact.

On September 12, 2013, the March 18, 2013 and September 3, 2013 misconduct charges against Stalter were resolved in arbitration when Stalter and the County entered into a Stipulation of Settlement of the Charges, also known as a "Last Chance Agreement." (Plf. Resp. ¶110.) Stalter agreed to a 120 day suspension without pay and further agreed that if he engaged in similar conduct to that alleged in the charges, including failure to follow a direct order, the penalty if found guilty would be termination. (Plf. Resp. ¶112.)

In December 2013, Stalter returned to work and he was temporarily changed from the A-line to the B-line shift, where he remained for approximately one week before returning to the A-line shift. (Plf. Resp. ¶126.) The decision to temporarily transfer Stalter was not made by Undersheriff Jones but by a lower-ranking officer. (Plf. Resp. ¶127.) When Plaintiff returned to work following his 120-day suspension, he was directed to take field training. (Plf. Resp. ¶126.) The Defendants state that the term "field training" or "FTO" is interchangeably used with the term "refresher training" and is required of any officer who has been absent from the Sheriff's Office for an extended length of time. (Plf. Resp. ¶129.) Plaintiff contests this statement. He submits that refresher training and FTO are distinct and that he was required to undertake the

latter, which is training provided to new recruits only. (Stalter Decl. ¶¶26-27; J. Statler Dec. ¶¶6-8 ) He further submits that refresher training refers to informal training to bring an officer up to speed after being out an extended period of time. (*Id.*; Barry Dep. 152:2-9.*)*

Barry testified that not everyone who comes back from an extended absence is required to complete FTO. (Barry 152:18-23.) Plaintiff admits there is no policy governing the length of refresher training. (Plf. ¶130.) Plaintiff further admits that Deputies other than Stalter who have been absent for a period of time have been required to undergo refresher training. (Plf. Resp. ¶132.) Plaintiff admits that a Deputy on refresher training receives the same wages, leave accruals and benefits as all other deputies. (Plf. Resp. ¶133.) However, Plaintiff disagrees with Defendant's contention that the refresher training was not disciplinary in nature. Plaintiff states that the refresher training was imposed in a manner that unduly and unnecessarily restricted his ability to perform his job and served no purpose other than to punish him. (Plf. Resp. ¶133.)

Plaintiff underwent training for approximately a four-month period (Butterfield Affidavit ("Butterfield Aff."), ECF No. 49, ¶19). For most of that period he was subject to desk duty. (cite). Sgt. Butterfield, who is not a Defendant in the lawsuit, stated that this type of training is uniquely tailored to each individual officer. (Butterfield Aff. ¶18.) Furthermore, Sgt. Butterfield stated that unlike other deputies who underwent the training, Plaintiff was not required to repeat the training. (Butterfield Aff. ¶19.)Some Deputies are ordered to repeat refresher training two or three times. (Butterfield Aff. ¶21.) Defendants Barry and Undersheriff Jones were involved in the decision to require Plaintiff to complete FTO training. ( Def. Resp. Interrogs. No. 9 at 12.)

On April 8, 2014, Stalter was assigned to the communications desk when a call came in from another police agency. (Plf. Resp. to Def. ¶144.) Defendant maintains the call was for backup assistance. (Compl. ¶108.) Plaintiff states the call was for an officer in distress and such

calls require a more urgent response. (Stalter Decl. ¶32.) Stalter responded to the call and on his way to the scene his motor vehicle got into a collision. (Plf. Resp. ¶148.) The extent of the damage is in dispute. Defendants state Stalter hit a guardrail, causing front end damage to the police department vehicle. (Jones Dep. 101:1-25-102:1-4.) Plaintiff denies this, stating that the collision only caused superficial scratches to the body of the vehicle near the rear driver-side tire. (Stalter Decl. ¶ 33.) Defendants state Barry determined Stalter was driving at an unreasonable rate of speed when he slid through an intersection and crashed into a guardrail on the other side of the intersection. (Barry Dep. 112:1-25-113:2-24.) Plaintiff denies that he was traveling at an unreasonable rate of speed and points to Barry's testimony asserting that he does not remember what rate of speed Plaintiff was traveling at. (*Id*.) Section 44 of the Orange County Sheriff's Policies and Procedures states that a Deputy Sheriff must operate a vehicle within the limits of the law and in a safe manner. (Plf. Resp. ¶156.)

On May 12, 2014, Barry brought disciplinary charges against Stalter, charging him with responding to a call with poor judgment, driving recklessly, leaving the scene of an accident and damaging a department vehicle. (Plf. Resp. ¶157.) Plaintiff admits that Barry relied upon information he received from other Deputy Sheriffs, including a written memorandum from various officers, when he wrote disciplinary charges against Stalter related to the events of April 8, 2014. (Plf. Resp. ¶158.) Barry proposed Stalter's termination. ( Plf. Resp. ¶159.) Stalter was suspended pending arbitration with an order to return to work on July 30, 2014 (Plf. Resp.¶¶ 166, 68).

On July 30, 2014, Plaintiff resigned from his position in the Sheriff's Department. Earlier in the morning, Captain Hamil called Barry while he was on his way to the office and advised him that Stalter wanted to resign from employment. (Plf. Resp. to Def. ¶170.) Plaintiff states that

a Captain in the Sheriff's Department told him he had three minutes to sign a generic resignation letter and that if he failed to do so, he would be brought up on charges of leaving his post without authorization. (Stalter Dep. 301:1-25-302:1-25.) Defendants deny that Captain Hamil or anyone else said that. (Barry Dep. 186:1-25-187:1-25.) Barry and Captain Hamil were involved with negotiating the terms of Plaintiff's resignation. (Plf. Resp. to Def. ¶¶182, 185.)

## I. First Amendment Retaliation Claim

"A plaintiff asserting a First Amendment retaliation claim must establish that: '(1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech.'" *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015) (quoting *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011)). To sustain a claim, a plaintiff must show that a reasonable employee would have found the retaliatory action to be "materially adverse." *Burlington Northern v. Santa Fe Railway*, 548 U.S. 3, 68, 126 S. Ct. 2406 (2006).

Plaintiff argues that he was subject to a number of adverse actions in retaliation for submitting his Supporting Affidavit in Johnson's Article 78 proceeding. However, Plaintiff is unable to proffer sufficient evidence to sustain a retaliation claim as a matter of law.

Plaintiff has not demonstrated that his refresher training was adverse or caused by his submission of the Supporting Affidavit. Furthermore, Plaintiff cannot prove that his refresher training was wrongful or subjected him to more onerous requirements than other deputies. Both Plaintiff and Defendant focus on whether Plaintiff's training was similar to the training of other deputies with his experience level. But that focus ignores a key point: the training deputies receive is not one-size-fits-all. Sgt. Butterfield, who is not a Defendant in the lawsuit and responsible for deputy training, testified that deputy refresher training was uniquely tailored to

13

individual officers. Plaintiff does not proffer specific facts showing that the Sheriff's Department must give the exact same training to everyone. In fact, Plaintiff admits that there is no policy governing the length of refresher training. The record is void of any evidence that his refresher training was more onerous than any others in terms of length or intensity.

Plaintiff admits that he received the same wages, leave accruals and benefits during his four month training period and was not treated adversely with regards to compensation. But Plaintiff argues that because he was effectively relegated to desk duty during his training period, his opportunities for advancement were materially impacted. It is true that the law recognizes that a lateral transfer that does not result in a reduction in pay or benefits may be an adverse employment action so long as the transfer alters the terms and conditions of the plaintiff's employment in a materially negative way. *See De la Cruz v. New York City* Human Resources Admin. Dep't of Social Servs., 82 F.3d. 16, 21 (2d Cir. 1996) (transfer to "less prestigious" unit of social services department with reduced opportunities for professional growth was adverse employment action); *Rodriguez v. Board of Educ.*, 620 F. 2d. 362, 366 (2d. Cir. 1980) (transfer of experienced middle school art teacher to elementary school constituted adverse action).

However, this Court finds Plaintiff's argument that four months of desk during his retraining period was a materially adverse action lacks merit. While he may have felt slighted by the retraining, hurt feelings are not tantamount to an adverse action. For an action to be materially adverse, it "must be more disruptive than a mere inconvenience or an alteration of job responsibilities" and "might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." (*Id*.) (internal quotation and citation omitted). *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466

(2d Cir.1997). Stalter cannot show his Affidavit caused Defendants to take a materially adverse action against him nor can he show he suffered a cognizable injury by undergoing a four month training period in the circumstances of this case and as required of all officers who are out on leave.

Furthermore, Plaintiff's argument that Defendant Barry would not have taken the same action against the Plaintiff but for the Supporting Affidavit does not sustain the retaliation claim. Plaintiff argues that because Defendant Barry had not read the specific terms of the "Last Chance Agreement" between the Plaintiff and the Sheriff's Department, it shows that Barry would not necessarily have proposed termination. However, the fact that Barry did not read the Last Chance Agreement line by line does not necessarily mean he was not generally aware that the Plaintiff had two prior misconduct charges against him. Barry could have proposed Stalter's termination regardless of whether he knew the specifics of the "Last Chance" agreement.

In any event, Plaintiff's argument that he was coerced into resigning (or constructively discharged) fails as a matter of law. Defendants proffered charges against Plaintiff pursuant to the "Last Chance Agreement," which was a stipulation pursuant to a settlement provided that Defendant would be terminated if he committed another offense. In that agreement, Plaintiff knowingly and voluntarily waived his right to challenge his termination by pursuing claims like the ones he filed in this Court. Courts in our Circuit have upheld these agreements as valid and enforceable where the waiver is knowing and voluntary. *Taddeo v. County of Niagara* WL 980260 at *7 (W.D.N.Y. March 15, 2010); *Kwok v. New York City Transit Authority,* WL 82986 at *5 (W.D.N.Y. July 23, 2001); *Knight v. State of Conn.* WL 306447 at *7 (D.Conn. February 22, 2000). Therefore, any argument that he was wrongly terminated or retaliated against is not supported by the facts.

## II.     Monell Liability Claim

Plaintiff argues that his due process rights to intimate association were violated and that the County should be held liable under *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978).

The Constitution protects individual rights of privacy and intimate association. *Roberts v. United States Jaycees* 468 U.S. 609, 617-18, 104 S.Ct. 3244 (1984). ("The Court has long recognized that, because the Bill of Rights is designed to secure individual liberty, it must afford the formation and preservation of certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State.") In *Roberts*, the Court articulated the kinds of relationships afforded this type of Constitutional protection.[3] The Court stated relationships "that attend to the creation and sustenance of a family" were protected. (*Id*. at 619-20.)   "Family relationships, by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences and beliefs but also distinctively personal aspects of one's life." (*Id.*)

 However, the Supreme Court has since declined to elaborate on whether adulterous relationships are constitutionally protected under the umbrella of a right to intimate association. *City of North Muskegon v. Briggs*, 473 U.S. 909, 105 S.Ct. 3535 (1985)( White, J., dissenting from denial of certiorari)(observing a disagreement among federal courts "over whether extra-marital sexual activity, including allegedly unlawful adulterous activity is constitutionally

---

[3] The *Roberts* court rooted the right of intimate association in both the First Amendment and the Fourteenth Amendment's due process clause. Subsequently, there has been a question as to the Constitutional source of the right – whether it is the First or Fourteenth Amendment. *Adler v. Pataki*, 185 F.3d. 35, 42 (2d Cir. 1999) ("The source of the intimate association right has not been authoritatively determined.") However, in *Adler, the* Second Circuit suggested that courts have generally analyzed claims that some adverse state action burdens an individual marital relationship under a First Amendment doctrine of marital association, as opposed to broader regulations affecting a class of burdened persons, which have been analyzed under equal protection and due process clauses. (*Id.* 43.)  As such, we will analyze Plaintiff's claims under the First Amendment.

protected in a way that forbids public employers to discipline employees who engage in such activity."). In *Patel v. Searles*, 305 F.3d. 130, 138-139 (2d. Cir. 2002), the court acknowledged that the plaintiff had a clear right to intimate association that extended to his family relationships but the Court said it still had to determine, in the "specific factual context, whether defendants' actions violated a clearly established 'constitutional right [] of *which a reasonable person would have known.*' (*Id.*)(citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct.2727 (1982)). In *Bates v. Bigger*, 56 Fed.Appx.527, 529 (2d. Cir. 2002), a case with similar facts as those here and involving the same Orange County Sheriff's Department, the Second Circuit affirmed in a summary order the District's Court's conclusion that it was inconclusive whether the right of intimate association protected an extramarital affair (noting that plaintiffs' association was not the kind that 'attend to the creation and sustenance of a family' (quoting Roberts, 468 U.S. at 620, 104 S.Ct. 3244 ) but rather, "plaintiffs' relationship was of the sort that serve to break families apart ..."(*Id.* 170)).

        Here, given that Plaintiff was involved in an extramarital affair, it is not clear that the Defendants' actions violated a "clearly established" Constitutional right. However, it was not the adulterous relationship alone that was the only matter of concern here. Plaintiff and his paramour were involved in a domestic dispute with his wife and mother-in-law, where the state police had to be called. Plaintiff allegedly got into a physical altercation with his mother-in-law while in possession of his holstered gun. Plaintiff purportedly punched his mother-in-law's arm, although Plaintiff contends that he did this to prevent her from reaching for his gun. Whether Plaintiff or Bodensizek was the instigator of the incident is irrelevant. Chief Onerati issued the "no-contact" order in an effort to calm a tense situation and Plaintiff did not follow that order.

The Sheriff's Department Code of Conduct specifically states: "Employees shall conduct themselves at all times, both on and off duty, in such a manner as to reflect most favorably on the Orange County Sheriff's Office. Conduct unbecoming of an employee shall include that which bring the Orange County Sheriff's Office into disrepute or reflects discredit upon the employee as an employee of this office or that which impairs the operation or efficiency of the Office or employee." (Worthy-Spiegl Decl. Ex. H at 1.) It is not beyond reason to determine that Plaintiff's involvement in the domestic incident that turned physical, while someone reached for his gun, brings disrepute to the Office and was unbecoming of the Plaintiff. While numerous Courts have acknowledged a police officer's right to privacy regarding his sexual affairs, they also maintain that when his personal sexual activities and living arrangements impairs his job performance, the police department has a legitimate concern. *Briggs v. North Muskegon Police Dept*., 563 F. Supp. (W.D. Michigan May 5, 1983) *aff'd* 746 F.2d. 1475 (6th Cir. 1984); *Shuman v. City of Philadelphia*, 470 F. Supp. 449, 459 (April 18, 1979) ("Conceding that the police Department has "an interest and may legitimately investigate some areas of personal, sexual activities engaged in by its employees where those activities impact upon job performance.").

Given that there was an ongoing internal affairs investigation of the incident, Plaintiff's privacy interest was lessened. *Adler*, 185 F.3d 35 at 44 (1999) ("Recognizing that in cases where a public employee is discharged because of the allegedly disruptive effect of his own, normally protected speech, courts are required to seek 'a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of public services it performs through its employees.'" (quoting *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S. Ct. 1731 (1968))); *Shawgo v. Spradlin*, 701 F.2d. 470, 483 (1983) ("… police officers enjoy no constitutionally protected right to privacy

against undercover and other investigations of their violations of departmental regulations …");

*Arellanes v. Civil Services Com*, 41 Cal. App. 4th 1208, 1218 (1995)(asserting that police departments normally may determine what kind of conduct comes within scope of rule concerning associations detrimental to image of the department).

For purposes of establishing liability, the question is whether a reasonable person would have known that Defendants' actions violated a clearly established constitutional right. Given the context here, it was not unreasonable for Defendants to issue the no contact order. The personal drama in Plaintiff's life was starting to spill over into the public eye and suggests that his private, off-duty living arrangements was affecting the performance of his duties. When state police are called to a domestic incident, it becomes a matter of concern for the Sheriff's Department. Perhaps the Sheriff's Department could have issued a less intrusive and more narrowly tailored "no contact" order, one, which ordered the Deputies to refrain from contact on the job only or discussing an internal investigation of the matter, as opposed to a total prohibition on all contact. But, as our Supreme Court has stated about an employee's First Amendment rights, "a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connic v. Myers*, 461 U.S. 138, 147, 103 S.Ct. 1684 (1983). Under *Connic,* a court gives "wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch." *Id*. at 151.   Here, there was nothing objectively unreasonable about the "no contact" order given that an ongoing internal affairs investigation was underway, the situation had become heated and seeped into public view, and had the potential to cause further damage to the reputation of the

County Sheriff's Department given that two Sheriff's deputies were involved in the domestic incident.

Further, it is well settled that "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 676, 129 S.Ct. 1937 (2009). A municipal entity can only be held vicariously liable under § 1983 if the "execution of a government's policy or custom . . . inflicts the injury . . . ." *Monell v. Dep't of Social Servs. of the City of N.Y.*, 436 U.S. 658, 694 (1978). Thus, *Monell* dictates that any § 1983 claim against a municipal entity must be premised on the theory that the municipal actor's allegedly unconstitutional "acts were performed pursuant to a municipal policy or custom." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004); *see generally Monell*, 436 U.S. at 692–94.

Courts in this Circuit apply a two prong test for § 1983 claims brought against a municipal entity. *Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985) (internal citation omitted). First, the plaintiff must "prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving officer." *Id.* "Second, the plaintiff must establish a causal connection—an 'affirmative link'—between the policy and the deprivation of his constitutional rights." *Id.* (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 836, n.8 (1985)).

To satisfy the first requirement, a plaintiff must allege the existence of:

(1) a formal policy which is officially endorsed by the municipality; (2) actions taken or decisions made by government officials responsible for establishing municipal policies which caused the alleged violation of the plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom or usage and implies the constructive knowledge of policy-making officials; or (4) a failure by official policy-makers to properly train or supervise subordinates to such an extent that it amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact.

*Moray v. City of Yonkers*, 924 F. Supp. 8, 12 (S.D.N.Y. 1996) (internal citations and quotation marks omitted); *see also Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–77 (S.D.N.Y. 2010) (quoting *Moray* and updating citations to cases). A plaintiff is not required to identify an express rule or regulation in order to establish a *Monell* claim, and a court may infer a municipal policy from acts or omissions of the municipality's policy makers,[4] but in the absence of other evidence, a "single incident of errant behavior is an insufficient basis for finding that a municipal policy caused plaintiff's injury." *Sarus v. Rotundo*, 831 F.2d 397, 402–03 (2d Cir. 1987); *see also DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998) ("[A] single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy.") (quoting *Ricciuti v. N.Y. City Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991)) (internal quotation marks omitted); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 125 (1988) (plurality opinion) (explaining that only municipal officials with "final policymaking authority" concerning particular activities giving rise to plaintiff's claims "may by their actions subject the government to § 1983 liability") (internal citation omitted). "In the end, therefore, a plaintiff must demonstrate that, through its deliberate conduct, the municipality was the moving force behind the alleged injury." *Hayes*, 853 F. Supp. 2d at 439 (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008)) (internal quotation marks omitted).

Plaintiff contends that Sheriff Dubois delegated all final, disciplinary authority to Defendant Jones, and that Jones's actions constitute municipal policy. Authority to make municipal policy may be granted either directly by legislative enactment or may be delegated by an official who possesses such authority. *Pembaur*, 475 U.S. at 483. The official need not

---

[4] In *Pembaur v. City of Cincinnati*, the Supreme Court stated that municipal liability under § 1983 may be established by even the single act of a municipal policymaker whose acts represent official policy. 475 U.S. 469, 480 (1986).

possess broad, policymaking authority; rather, the inquiry for the court is whether the official

"had final policymaking authority in the particular area involved." *Jeffes v. Barnes*, 208 F.3d 49,

57 (2d Cir. 2000) (citing *Jett*, 491 U.S. at 737; *Praprotnik*, 485 U.S. at 123–25).

The plaintiff in *Baity* asserted a nearly identical theory of *Monell* liability.   In *Baity*,

Plaintiff's counsel "argued that [the sheriff] delegated his hiring authority to the undersheriff [],

thus making [the undersheriff] the official policymaker for the County with respect to

employment policy in the Sheriff's Office and rendering [the undersheriff] the 'policymaker' for

*Monell* purposes." 51 F. Supp. 3d at 441–42.  Judge Karas rejected this argument on a number

of grounds: (1) there was no evidence in the record to support the plaintiff's theory; (2) the

plaintiff failed to provide the court with any supporting case law; and (3) the plaintiff did not

name the undersheriff as a defendant. *Id*. at 442.

Here, the Complaint alleges that Sheriff DuBois "delegated all final policy-making

authority as to disciplinary matters to defendant Jones."  (Compl. ¶¶ 160, 173.)  That assertion is

bolstered by the allegation that Captain Hamil told Plaintiff he would have to seek approval of

Plaintiff's proposed resignation letter from the Number 2, which Plaintiff contends is a reference

to Defendant Jones.  (*Id*. ¶ 136.)

At the Motion to Dismiss stage of this case, the Court cautioned Plaintiff that as the case

progressed, to prove such a claim, Plaintiff would have to marshal sufficient evidence that

Sheriff Dubois delegated final policymaking authority about disciplinary matters to Defendant

Undersheriff Jones. The Court said that Sheriff Dubois's non-involvement in Plaintiff's

termination, absent additional evidence of delegation of policymaking authority to Defendant

Undersheriff Jones, cannot substantiate *Monell* liability. The Plaintiff argues that the record

demonstrates the Plaintiff delegated all day-to-day responsibility for managing the Department's

operations to Undersheriff Jones. The Plaintiff points to evidence that Undersheriff Jones testified he did not have to go to the Sheriff before deciding to approve or deny personnel decisions. In fact, his testimony was not exactly as Plaintiff suggests. Undersheriff Jones stated that there was no requirement that he brief the Sheriff about personnel decisions but that he did that on his own initiative, as a matter of course.

But the key question is not what Undersheriff Jones believed his authority was at the time, but rather what was the actual scope of Jones's authority as a matter of law. "An official has final authority if his decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions." *Rookard v. Health and Hospitals Corp*. 710 F.2d 41, 46 (2d. Cir. 1983). To meet his burden, Plaintiff must point to evidentiary proof that an official's scope of employment and his role within the municipal organization reflects their "policy-making authority." Plaintiff asserts that Undersheriff Jones handled all the day-to-day operations with respect to personnel decisions. However, the discretion to hire and fire employees does not necessarily mean one has the final policy-making authority for establishing county employment policy. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292 (1986). Furthermore, even if there was sufficient evidence that Sheriff Dubois informally delegated formal or informal policy-making authority to Undersheriff Jones, there is no evidence that Undersheriff Jones was violating Plaintiff's Constitutional rights or that his right to intimate association was clear in the context.

Furthermore the Second Circuit has clearly held that "isolated acts…by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy or usage that would justify municipal liability under §1983." *Jone v. Town of East Haven*, 691 F.3d 72,81 (2012) (holding that evidence of two or three instances of excessive force

over several years fell far short of showing a municipal policy or custom that showed deliberate indifference to the abuse of the Constitutional rights of black people); *see also, Carmichael v. City of New York*, 34 F.Supp.3d. 252, 263 (2014) (Holding that the plaintiff failed to produce evidence sufficient to show that the NYPD had a widespread and persistent but unspoken practice of failing to conduct immediate searches for African-American persons reported missing).

In short, Plaintiff has failed to show that the "no contact" order was clearly unconstitutional or that it was practice that was widespread. For this reason, his *Monell* claim fails.

## CONCLUSION

For the foregoing reasons, the Plaintiff's First Amendment retaliation claim and *Monell* claim, premised on the right of intimate association, are dismissed. Defendants' motion for summary judgment is GRANTED. The Court respectfully directs the Clerk to terminate the motion at ECF No. 45, to enter judgment in favor of the Defendants and to terminate the action.

Dated:    November ⸱⸱, 2018                    SO ORDERED:
          White Plains, New York

                                        _____
                                            NELSON S. ROMÁN
                                        United States District Judge